*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* Conservatorship of DLW.

UNPUBLISHED
October 20, 2025
10:23 AM

No. 373297
Wayne Probate Court
LC No. 2021-866894-CA

Before: FEENEY, P.J., and BORRELLO and BAZZI, JJ.

PER CURIAM.

Dr. Wendy Webster-Jackson, as the conservator for her father, Donald Lee Webster (DLW), appeals as of right the probate court's orders denying the petition to terminate the conservatorship, denying the petition to allow the second amended first accounting, and approving $3,000 in fees to the guardian ad litem.[1]  For the reasons set forth in this opinion, we affirm in part and reverse in part.

## I. BACKGROUND

This appeal arises from what appears to be a protracted dispute over whether DLW's assets have been properly accounted for by Webster-Jackson as his conservator.  DLW has three adult daughters: Webster-Jackson, Dionne Webster-Cox, and LaToya Webster.  He also has an adult son, Donald Webster, Jr.[2]  Webster-Jackson petitioned for the appointment of a conservator for DLW on July 19, 2021.  Attorney Joelynn Stokes was appointed as DLW's guardian ad litem

---

[1] Although the appellate arguments advanced by Webster-Jackson involve a single hearing at which multiple issues were addressed, it does not appear that Webster-Jackson actually contests the denial of the petition to terminate the conservatorship.

[2] For the sake of clarity, the father and legally protected individual in this case will be referred to as DLW.

-1-

(GAL) on August 19, 2021. Letters of Conservatorship, indicating that Webster-Jackson was appointed as conservator for DLW, were issued by the probate court on September 29, 2021.

The present appeal involves rulings made by the probate court following an October 28, 2024 hearing. The GAL report submitted by Stokes on July 22, 2024 contains an adequate summary of the disputes that had evolved since the conservatorship began in 2021, which essentially involved concerns about the amount of spending from DLW's estate and the lack of adequate documentation supporting the expenditures:

> I report to the Court as follows:
>
> This matter is before the Court for first hearing on the Petition to Allow Second Amended 1st Annual Account and the adjourned hearing on the 2nd Annual Account. Note is made that the 1st Annual Account was due over 1 ½ years ago in September 2022. Hearings were held on the 1st Account and the Amended 1st Account. At each hearing errors and issues were noted and Petitioner was given opportunity to correct. The Second Amended 1st Account was to be filed within 30 days of the October 2023 hearing.
>
> Petitioner subsequently retained her sister as counsel[3] who filed in March of 2024, the 2nd Annual Account (which was due September 2023). However, the format in which the 2nd Account is filed contained the same problems that resulted in the rejection of Petitioners 1st Account filed. Counsel was apprised of this fact and also encouraged to review the prior GAL Reports to see the issues noted in addition to formatting. In addition, the 1st Account having never been allowed, the 2nd Account was untimely. At the June 3, 2024 hearing the court directed the filing of the Second Amended 1st Account. I provided counsel with a sample account as I did for her sister. Counsel sent drafts of the Account which I reviewed for formatting and readability only, having already outlined in 3 GAL Reports the concerns with spending and lack of documentation.
>
> Counsel also filed a **3rd Amended Inventory** which **lists the starting balance of the Chase bank account as $4,761.89. The Chase bank statement she provided however, reflects a starting balance of $5,189.89.** The Amended Inventory dated January 2022 accurately reflects this amount (See Exhs A & B). The 3rd Amended Inventory also reflects real property held in Texas as does the 2nd Amended Inventory. In the October 2023 GAL Report, it was noted that the Cass County property appeared to be owned by Ouida Webster per documentation provided.

---

[3] Webster-Jackson was initially represented by attorney Cynthia Williams, but Webster-Jackson subsequently retained her sister, Webster-Cox, as her attorney.

Note is made that it was initially reported that Mr. & Mrs. Webster[4] owned property on Dexter and payment of utility bills totaling $11,172 were reported in the 1st Amended Account. This present Account reports only $2,247 in utilities, but $6,365 is reported in Wayne County property taxes. No Wayne County property appears to be owned by Mr. Webster (as reflected by the 3rd Amended Inventory filed). It was initially reported that he owned property at 8735, 8738 and 8739 Dexter, however as noted in the October 2023 GAL Report, Mr. Webster has no ownership in these properties. No other property tax statements have been provided.

Healthcare expenses of $8,716 included payments of $5,835 to Heart2Heart and Comfort Care with the balance paid to individuals. As noted in the prior GAL Report, a contract for services was provided for Heart2Heart for $30/hour 3 hours/day 4 days/week for a total of $360 per week, however no cancelled checks or paid receipts from Heart2Heart were provided. No documentation was provided for Comfort Keeper.

Per the spreadsheet provided by Counsel (Exh C), **Household Expenses totaled $37,609** and included various restaurants, Doordash, Instacart, Sams Club, various grocery stores, Lyft, Amazon and clothing stores. No receipts provided. It also included payments to individuals, including payments to Jose Pez. Petitioner previously reported she paid him approximately $8000 for household chores for which no invoices or receipts are provided.

Petitioner reported in the 1st Amended Account **ATM withdrawals of $8,505** and in this Second Amended Account **she reports $9,405.50 in ATM withdrawals**. She states **these withdrawals were actually an allowance paid to her mother, Mr. Webster's wife, for whom she sought Guardianship and conservatorship.** And given the allegations in the petition and subsequent statements made, one questions the prudence of giving Mrs. Webster funds in addition to the income she receives. **Mrs. Webster reportedly receives approximately $2,300 per month ($27,600 per year) from Social Security and State of Michigan pension.**

In sum, the expenditure of $70,000 for one individual with no mortgage obligation or apparent property ownership, and with very little documentation to support the expenditures is alarming. Additionally, the challenges the conservator faced in getting an account filed and approved in a timely fashion, as well as the inability to document expenditures evidences an inability to meet the duties and obligations of a conservator.

---

[4] This appears to be a reference to DLW and his deceased spouse.

Stokes recommended denying the petition to allow the second amended first account, appointing a special fiduciary, and ordering the estate to pay the GAL fee with an invoice to be provided to the court.

On July 22, 2024, Webster-Jackson filed a petition to terminate the conservatorship for DLW. Webster-Jackson stated that the conservatorship should be terminated because DLW's "mental status has improved since the filing, therefore no longer requiring a conservator."

Webster-Jackson also filed objections to the GAL Report. She argued that the starting balance for the Chase bank account was properly determined based on the date that Webster-Jackson's Letters of Authority were issued, which was September 29, 2021, and that the starting balance thus properly did not include "the entry from September 28, 2021." Webster-Jackson further stated that Ouida Webster was DLW's deceased mother and that the Cass County property belonged to DLW because he was his mother's sole heir. Additionally, Webster-Jackson indicated that DLW paid the utilities and property taxes for the Dexter property, that was apparently owned by his spouse, because he "provided for her." Webster-Jackson provided cancelled checks, bank statements, invoices, and text messages to document and support expenditures, and she argued that it was not reasonable to expect her to also provide individual receipts for all expenditures.[5] She also stated that the guardianship and conservatorship petitions for DLW had been withdrawn and the allegations therefore were never proven. Webster-Jackson requested the removal of Stokes as GAL. Webster-Jackson also filed a petition to allow the second amended first account on September 24, 2024.

The probate court held a hearing on October 28, 2024, to address the outstanding petitions to terminate the conservatorship and to allow the second amended first accounting. Relevant to the issues on appeal, the probate judge first ruled that the "beginning balance, according to the Chase checking statement of September 28, 2021 says, $5,189.89, that should've been your starting balance on this account."

Regarding the Wayne County property taxes, Webster-Jackson testified, "I paid those taxes because that was the home my mother, father and my sister live in. And it had been their residence." The probate judge observed that the inventory did not list any Wayne County real property, and Webster-Cox admitted this was true. However, after much discussion on the record, it became evident that the property was still titled in the name of Webster-Jackson's and Webster-Cox's deceased maternal grandfather. The probate judge ruled that the property taxes for that property should not have been paid out of DLW's estate because he did not have a legal interest in the property.

The probate judge abruptly ended the hearing, ruled that the petitions to terminate the conservatorship and allow the second amended first accounting were denied, and ordered Stokes

---

[5] Webster-Jackson's attachments in support of her contentions included records of tax payments to the Wayne County Treasurer, cancelled checks to home care agency "Heart 2 Heart," invoices and scheduling text messages from "Comfort Keepers," and cancelled checks to Jose Pez for housecleaning and landscaping services.

to provide a statement showing her GAL fees. After Stokes submitted her bill, the probate court entered an order stating, "After review of the GAL's statement of service the court approves $3,000.00 to be paid by the estate to Attorney Joelynn Stokes." This appeal followed.

## II. INVENTORY AND ACCOUNTING ISSUES

On appeal, Webster-Jackson first challenges the probate court's rulings related to her inventory and first accounting. Specifically, Webster-Jackson maintains that the value of the Chase account for purposes of the inventory should have been determined based on the day her letters of conservatorship were issued rather than before that date, and she also maintains that it was proper to pay the Wayne County property taxes from DLW's estate.

## A. STANDARD OF REVIEW

This Court reviews appeals from a probate court decision under the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq.* "on the record, not de novo." *In re Temple Marital Trust*, 278 Mich App 122, 127-128; 748 NW2d 265 (2008). "The trial court's factual findings are reviewed for clear error, while the court's dispositional rulings are reviewed for an abuse of discretion." *Id.* at 128. "An abuse of discretion occurs when the court's decision falls outside the range of reasonable and principled outcomes." *In re Conservatorship of Shirley Bittner*, 312 Mich App 227, 235; 879 NW2d 269 (2015). "A finding is clearly erroneous when a reviewing court is left with a definite and firm conviction that a mistake has been made, even if there is evidence to support the finding." *Id.* at 236 (quotation marks and citation omitted).

"Issues of statutory construction present questions of law that this Court reviews de novo." *Temple Marital Trust*, 278 Mich App at 128. This Court's primary objective when interpreting statutes is "to ascertain and give effect to the intent of the Legislature," based on "the specific language of the statute" and "considering the fair and natural import of the terms employed, in view of the subject matter of the law." *In re Portus*, 325 Mich App 374, 381; 926 NW2d 33 (2018) (quotation marks and citations omitted). The probate court's legal conclusions are also reviewed de novo. *In re Conservatorship of Brody*, 321 Mich App 332, 336; 909 NW2d 849 (2017).

## B. GENERAL BACKGROUND LEGAL PRINCIPLES

This matter involves the application of Article V of EPIC, MCL 700.5101 *et seq.*, which "provides protection for individuals under disability." *In re Conservatorship of Brody*, 321 Mich App at 336. The standards for appointing a conservator are contained in MCL 700.5401, which provides in relevant part as follows:

(3) The court may appoint a conservator or make another protective order in relation to an individual's estate and affairs if the court determines both of the following:

(a) The individual is unable to manage property and business affairs effectively for reasons such as mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, confinement, detention by a foreign power, or disappearance.

-5-

(b) The individual has property that will be wasted or dissipated unless proper management is provided, or money is needed for the individual's support, care, and welfare or for those entitled to the individual's support, and that protection is necessary to obtain or provide money.

(4) The court may appoint a conservator in relation to the estate and affairs of an individual who is mentally competent, but due to age or physical infirmity is unable to manage his or her property and affairs effectively and who, recognizing this disability, requests a conservator's appointment.

A conservator must "act as a fiduciary and observe the standard of care applicable to a trustee" with respect to the powers conferred by the conservatorship. MCL 700.5416. "Appointment of a conservator vests in the conservator title as trustee to all of the protected individual's property, or to the part of that property specified in the order, held at the time of or acquired after the order, including title to property held for the protected individual by a custodian or attorney-in-fact." MCL 700.5419(1). Under MCL 700.5420(1), "[l]etters of conservatorship are evidence of transfer of all of the protected individual's property, or the part of that property specified in the letters, to the conservator," and an "order terminating a conservatorship is evidence of transfer of the property subjected to the conservatorship from the conservator to the protected individual or that individual's successors."

As relevant to the issues presented in this appeal, conservators have certain reporting requirements. "Within 56 days after appointment or within another time period specified by court rule, a conservator shall prepare and file with the appointing court a complete inventory of the estate subject to the conservatorship together with an oath or affirmation that the inventory is believed to be complete and accurate so far as information permits." MCL 700.5417(1). "The conservator must keep suitable records of the administration and exhibit those records on the request of an interested person." MCL 700.5417(2). "A conservator shall account to the court for administration of the trust not less than annually unless the court directs otherwise, upon resignation or removal, and at other times as the court directs. On termination of the protected individual's minority or disability, a conservator shall account to the court or to the formerly protected individual or that individual's successors." MCL 700.5418(1).

The relevant court rules mirror these statutory reporting requirements. Pursuant to MCR 5.409(B)(2), a conservator must "file with the court a verified inventory of the estate of the protected person" within 56 days after being appointed. "Property that the protected individual owns jointly or in common with others must be listed on the inventory along with the type of ownership and value." MCR 5.409(B)(3). "A conservator must file an annual account unless ordered not to by the court." MCR 5.409(C)(1). "The accounting period ends on the anniversary date of the issuance of the letters of authority, unless the conservator selects another accounting period or unless the court orders otherwise." MCR 5.409(C)(2). Pursuant to MCR 5.409(C)(5),

The accounting is subject to the provisions of MCR 5.310(C)(2)(c) and (d), except that references to a personal representative shall be to a conservator. A copy of the corresponding financial institution statement or a verification of funds on deposit must be filed with the court, either of which must reflect the value of all liquid

assets held by a financial institution dated within 30 days after the end of the accounting period, unless waived by the court for good cause.

In turn, MCR 5.310(C)(2) provides in relevant part:

 (c) Contents. All accountings must be itemized, showing in detail receipts and disbursements during the accounting period, unless itemization is waived by all interested persons. A written description of services performed must be included or appended regarding compensation sought by a personal representative. This description need not be duplicated in the order. The accounting must include notice that (i) objections concerning the accounting must be brought to the court's attention by an interested person because the court does not normally review the accounting without an objection; (ii) interested persons have a right to review proofs of income and disbursements at a time reasonably convenient to the personal representative and the interested person; (iii) interested persons may object to all or part of an accounting by filing an objection with the court before allowance of the accounting; and (iv) if an objection is filed and not otherwise resolved, the court will hear and determine the objection.

 (d) Proof of Income and Disbursements. After filing and before the allowance of an accounting, the personal representative must make proofs of income and disbursements reasonably available for examination by any interested person who requests to see them or as required by the court. An interested person, with or without examination of the proofs of income and disbursements, may file an objection to an accounting with the court. If an interested person files an objection without examining the proofs and the court concludes that such an examination would help resolve the objection, the court may order the interested person to examine the proofs before the court hears the objection.

## C. INVENTORY

Here, Webster-Jackson first argues on appeal that the probate court erred by ruling that the starting balance for the Chase account was the balance of the account on September 28, 2021, for purposes of the initial inventory. Webster-Jackson maintains that she properly used the balance of this account on September 29, 2021, as the beginning balance for her inventory and accounting because her letters of conservatorship were issued that day. Webster-Jackson argues that the conservatorship began on the day her letters of conservatorship were issued.

As previously explained, a conservator is required to file "a complete inventory of the estate subject to the conservatorship . . . ." MCL 700.5417(1); see also MCR 5.409(B)(2). "Conservator" means "a person appointed by a court to manage a protected individual's estate." MCL 700.1103(j). "Estate" includes "the property of the decedent, trust, or other person whose affairs are subject to this act as the property is originally constituted and as it exists throughout administration." MCL 700.1104(b). "Appointment of a conservator vests in the conservator title as trustee to all of the protected individual's property, or to the part of that property specified in the order, *held at the time of or acquired after the order*, including title to property held for the protected individual by a custodian or attorney-in-fact." MCL 700.5419(1) (emphasis added).

As explained in the Reporter's Comment to this statutory provision, "[t]aking 'title as trustee' means the conservator acquires legal authority over the ward's assets." Martin & Harder, Estates and Protected Individuals Code With Reporters' Commentary (ICLE, March 2025 update), p. 490. "While not binding, the reporter's comments concerning EPIC may aid in the interpretation of a statute or rule." *In re Conservatorship of Shirley Bittner*, 312 Mich App at 242 (quotation marks and citation omitted). Here, Webster-Jackson's appellate argument raises the question of determining when this transfer of legal title to the conservator takes effect, such that the conservator is responsible for inventorying the property, because although there is no dispute that Webster-Jackson was responsible for including the Chase account in the inventory, the balance of a bank account obviously may fluctuate from day to day. "Implicit in the obligation to prepare an inventory is the duty to identify and, as appropriate for a particular situation, to take possession of the ward's assets to permit management of and give protection to them." Martin & Harder, p 489.

As previously stated, "[l]etters of conservatorship are evidence of transfer of all of the protected individual's property, or the part of that property specified in the letters, to the conservator." MCL 700.5420(1). Pursuant to MCR 5.402(D), "[a]fter entering an order appointing a fiduciary, the court must issue letters of authority after an acceptance of appointment is filed, and if ordered, the filing of the fiduciary's bond." "Letters of authority shall be issued after the appointment and qualification of the fiduciary" and "[i]f bond is ordered, the letters shall be issued after proof of bond has been filed with the court, unless otherwise ordered." MCR 5.202(A).[6] Furthermore, "[b]efore receiving letters, a conservator must qualify by filing with the appointing court a required bond and a statement of acceptance of the duties of the office." MCL 700.5412(1). "By accepting appointment, a conservator submits personally to the court's jurisdiction in a proceeding relating to the estate that may be instituted by an interested person." MCL 700.5412(5).

Reading these provisions together, it is evident that legal title over the protected individual's property is not actually transferred to the conservator until the letters of conservatorship are issued and that the conservator is therefore not responsible for the value of the inventoried property until that date. Cf. *In re Thomas Estate*, 211 Mich App 594, 601-602; 536 NW2d 579 (1995) (reasoning that the letters of authority defined the limitations on a guardian's authority over funds on deposit with a financial institution). The probate court in this case made an error of law in ruling otherwise. *In re Conservatorship of Brody*, 321 Mich App at 336. This legal error clearly affected the probate court's decision to reject Webster-Jackson's inventory and accountings, and we therefore vacate the probate court's order and remand for further proceedings applying the proper starting date for the determination of the initial inventory.

D. PROPERTY TAXES

Webster-Jackson next argues that the probate court also erred by finding that property taxes were improperly paid because DLW did not have a legal interest in the real property at issue. It

---

[6] This court rule applies to fiduciaries such as a conservator. MCR 5.201 ("Except for MCR 5.204 and MCR 5.208, which apply in part to trustees and trusts, rules in this subchapter contain requirements applicable to all fiduciaries except trustees and apply to all estates except trusts.").

appears from the record that there is some confusion about the state of title for various parcels of real estate held by DLW's family members. However, contrary to the probate court's approach, this is not the relevant focus of analysis for purposes of addressing the accounting for DLW's estate.

A "conservator shall act as a fiduciary and observe the standard of care applicable to a trustee." MCL 700.5416. The nature of a fiduciary relationship is defined in MCL 700.1212(1) as follows:

> A fiduciary stands in a position of confidence and trust with respect to each heir, devisee, beneficiary, protected individual, or ward for whom the person is a fiduciary. A fiduciary shall observe the standard of care described in section 7803 and shall discharge all of the duties and obligations of a confidential and fiduciary relationship, including the duties of undivided loyalty; impartiality between heirs, devisees, and beneficiaries; care and prudence in actions; and segregation of assets held in the fiduciary capacity. With respect to investments, a fiduciary shall conform to the Michigan prudent investor rule.

In turn, MCL 700.7803 states in relevant part, "The trustee shall act as would a prudent person in dealing with the property of another, including following the standards of the Michigan prudent investor rule."

Most importantly, MCL 700.5425 provides in relevant part as follows:

> A conservator may expend or distribute estate income or principal without court authorization or confirmation for the support, education, care, or benefit of the protected individual or the protected individual's dependents in accordance with the following principles:
>
> * * *
>
> (b) The conservator shall expend or distribute money reasonably necessary for the support, education, care, or benefit of the protected individual or a dependent with due regard to all of the following:
>
> (*i*) The estate size, the conservatorship's probable duration, and the likelihood that the protected individual, at some future time, may be fully able to be wholly self-sufficient and able to manage business affairs and the estate.
>
> (*ii*) The accustomed standard of living of the protected individual and the dependents.
>
> (*iii*) Other money or sources used for the protected individual's support.
>
> (c) The conservator may expend estate money for the support of an individual legally dependent on the protected individual and others who are members of the protected individual's household who are unable to support themselves and who are in need of support.

* * *

(e) In discharging a responsibility conferred by court order or this part, a conservator shall implement the principles described in section 5407(1) to the extent possible.

MCL 700.5407(1) provides:

The court shall exercise the authority conferred in this part to encourage the development of maximum self-reliance and independence of a protected individual and shall make protective orders only to the extent necessitated by the protected individual's mental and adaptive limitations and other conditions warranting the procedure. Accordingly, the court may authorize a protected individual to function without the consent or supervision of the individual's conservator in handling part of his or her money or property, including authorizing the individual to maintain an account with a financial institution. To the extent the individual is authorized to function autonomously, a person may deal with the individual as though the individual is mentally competent.

Here, the probate court failed to determine whether the property tax expenditure was proper under the factors provided in MCL 700.5425(b) or (c). Whether the property for which property tax was paid was *titled* in the name of the protected individual is not one of these factors. Notably, there was testimony that DLW lived in the home for which the property taxes were paid. The probate court made an error of law in failing to apply the proper legal framework in ruling on this issue. *In re Conservatorship of Brody*, 321 Mich App at 336. Thus, the probate court's order denying the petitions to allow the accountings is reversed and, on remand, the probate court should apply MCL 700.5425 in determining whether the expenditures were proper.

This conclusion is supported by this Court's analysis in *In re Adrienne Gierman*, unpublished per curiam opinion of the Court of Appeals, issued March 11, 2010 (Docket No. 288264).[7] In that case, the defendant was the conservator for her mother, Adrienne Gierman. *Id*. at 1. Gierman lived with the defendant for a period of time at the beginning of the conservatorship. *Id*. at 1-2. Gierman's sister sought to remove the defendant as conservator and challenged the defendant's accounting. *Id*. at 2. Relevant to the issue in the present case, Gierman's sister claimed that the defendant had engaged in "self-dealing" by using funds from Gierman's accounts to pay for utility bills at the defendant's home, to pay moving expenses for Gierman, and to pay the defendant's husband for "in-home care" of Gierman before she was moved to a facility. *Id*. Noting that MCL 700.5425 "authorizes conservators to expend money from the protected individual's estate to care for and benefit them," *id*. at 4, this Court reasoned:

Arguably, it was reasonably necessary for defendant to expend estate assets to pay for the utilities and in-home supervision required for Gierman's support and care. Defendant testified that, based on her brief research, bringing someone else

---

[7] "Unpublished opinions are . . . not binding authority but may be persuasive or instructive." *Haydaw v Farm Bureau Ins Co*, 332 Mich App 719, 726 n 5; 957 NW2d 858 (2020).

-10-

into the home to care for Gierman for required daily care or sending her to a day care facility was more expensive than paying her husband to perform this task. Defendant also explained that she had Gierman's account pay one-third of those utility bills because there were three adults in the home. Additionally, it could have been reasonably necessary to pay for moving Gierman's belongings when defendant's family moved to a new location. Defendant also stated that the portion of the moving costs attributed to Gierman was defendant's estimation based on weight of Gierman's possessions, and that Gierman had heavy furniture as well as boxes of books and magazines that Gierman wanted to keep. It is not necessary that the court approve or confirm these reasonably necessary expenses to support and care for Gierman. Trustees are not liable for mistakes or errors of judgment where they act in good faith within the limits of the law and the trust.

The court had reserved its ruling on the petition to remove defendant as conservator until the accounting was reviewed, and then denied the petition after the accounting was not objected to by the GAL or Gierman's children. The court did not find that defendant's actions indicated any fraud, bad faith, or overreaching that would require scrutinizing the transactions, and approved the transactions by accepting the first annual accounting as approved by the interested parties. . . . The denial of the petition under these circumstances was within the range of reasonable and principled outcomes. [*Id*. at 5.]

Hence, the relevant consideration under the circumstances of the present case is whether an expenditure for property taxes is for "the support, education, care, or benefit of the protected individual or a dependent" under MCL 700.5425(b) rather than whether the real property was titled in the name of DLW. *In re Adrienne Gierman*, unpub op at 4-5. The probate court should focus on this question on remand.

## III. GAL FEES

Finally, Webster-Jackson argues that the probate court erred by awarding fees to the GAL without making findings on the record that the fees were reasonable.

The crux of Webster-Jackson's appellate argument appears to be her contention that "[t]his Court should require GAL fees to be presented with a detailed report, discussed on the record, and subjected to judicial approval to ensure compliance with Michigan law." Webster-Jackson fails to acknowledge that Stokes submitted a detailed billing invoice supporting her requested fees of $3,220 and that the probate court entered an order approving the reduced amount of $3,000 in fees. Thus, it appears that Webster-Jackson essentially argues on appeal that the probate court should have held an evidentiary hearing to determine the reasonableness of the fees.

Section 5413 of EPIC provides that "[i]f not otherwise compensated for services rendered, a . . . guardian ad litem . . . appointed in a protective proceeding, is entitled to reasonable compensation from the estate." MCL 700.5413. The probate court must hold an evidentiary hearing regarding the reasonableness of the fees requested by the guardian ad litem if the party opposing the fees challenges the reasonableness of the requested fees. *Miller v Meijer, Inc*, 219 Mich App 476, 479; 556 NW2d 890 (1996); *Head v Phillips Camper Sales & Rental, Inc*, 234

Mich App 94, 113; 593 NW2d 595 (1999); *Souden v Souden*, 303 Mich App 406, 415; 844 NW2d 151 (2013); *In re Allen*, unpublished per curiam opinion of the Court of Appeals, issued April 26, 2011 (Docket No. 296350), p 3 (applying this rule to a guardian ad litem's request for attorney fees and court costs).

Here, Webster-Jackson does not claim to have objected to the reasonableness of Stokes's fees, to the court's order for Stokes to provide a billing statement, or to the probate court's order awarding the fees. The record does not appear to contain any such objection. Because Webster-Jackson failed to challenge the GAL fees in the probate court, she has not established error requiring reversal based on the lack of an evidentiary hearing on the matter. *Miller*, 219 Mich App at 479. Moreover, "Michigan generally follows the raise-or-waive rule of appellate review," *In re Conservatorship of Murray*, 336 Mich App 234, 240; 970 NW2d 372 (2021), and Webster-Jackson has thus waived appellate review of this issue by failing to raise it below because a party "may not remain silent in the trial court and then hope to obtain appellate relief on an issue that they did not call to the trial court's attention," *id*. at 241 (quotation marks and citation omitted).

Webster-Jackson also has not cited any binding authority for the proposition that she is somehow still entitled to a remand for an evidentiary hearing on the reasonableness of the GAL fee despite Webster-Jackson's failure to raise the issue below, and she therefore has abandoned this issue. *In re Temple Marital Trust*, 278 Mich App at 139 ("An appellant may not merely announce his or her position and leave it to this Court to discover and rationalize the basis for his or her claims.")[8] We thus affirm the probate court's order with respect to the GAL fees.

Reversed in part, affirmed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Kathleen A. Feeney
/s/ Stephen L. Borrello
/s/ Mariam S. Bazzi

---

[8] Webster-Jackson cites *In re Guardianship of Pobanz*, unpublished per curiam opinion of the Court of Appeals, issued December 9, 2021 (Docket No. 356546), claiming that it stands for the proposition that the probate court had a duty to "ensure that the fees were discussed and justified on the record." In that case, the trial court held a hearing sua sponte to address the petitioner's challenges to, among other things, being required to pay the fee for the GAL. *Id*. at 2. However, on appeal, the only issue addressed by this Court relative to the GAL fee was whether the trial court could properly order the GAL to be compensated if the GAL had failed to fulfill his statutory obligations under MCL 700.3505(1). *Id*. at 8. This Court ruled that the GAL was not entitled to compensation, pursuant to MCL 700.3505(2), because he did not fulfill his statutory duties set forth in MCL 700.3505(1). *Id*. Webster-Jackson does not cite any language in the opinion stating that a trial court has a legal obligation to hold hearings on the reasonableness of GAL fees sua sponte or that it is reversible error for such a hearing not to have been held sua sponte, and we do not discern any language in the opinion that would support such assertions. Webster-Jackson's reliance on *In re Guardianship of Pobanz* does not mandate that this Court find reversible error on this issue in the present case.